**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JASON BRAUN and JIM CUMMINGS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>     v.<br><br>PHILADELPHIA INQUIRER LLC,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Jason Braun and Jim Cummings ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action lawsuit against Philadelphia Inquirer LLC ("Philadelphia Inquirer" or "Defendant") for violations of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). Plaintiffs' claims arise from Defendant's practice of knowingly disclosing its digital subscribers' personally identifiable information and viewed video media (collectively, "Personal Viewing Information") to a third party, Meta Platforms, Inc. ("Facebook"). Plaintiffs' allegations are based on personal knowledge as to themselves and their own acts and upon information and belief, including further investigation by Plaintiffs' attorneys as to all other matters.

## NATURE OF THE ACTION

1.      This is a consumer digital privacy class action complaint brought on behalf of all persons with Facebook or Instagram accounts who have digital subscriptions to, and have watched videos on, *inquirer.com*, a multimedia website owned and operated by Defendant.

1

2.      Plaintiffs bring this action in response to Defendant's practice of knowingly disclosing its subscribers' personally identifiable information—including a record of every video clip they view—to Facebook without first obtaining its digital subscribers' express consent in a stand-alone consent form that complies with the VPPA's statutory requirements.

3.      The Philadelphia Inquirer used first-party and third-party cookies, software development kits ("SDK"), pixels, Facebook's Business Tools, including Advanced Matching and Conversion API, to purposely track, record, collect, and transmit its digital subscribers' interactions with *inquirer.com*. Defendant purposely sent its digital subscribers' viewing history and personally identifiable information to its third-party business partners, including Facebook.

4.      Defendant knowingly installed the Facebook Pixel tool onto *inquirer.com* and controlled which types of information and data would be tracked and transmitted to Facebook. In conjunction with this, Defendant purposefully and specifically chose to: (1) track and record its digital subscribers' viewed video media, (2) disclose that information to Facebook[1] alongside its digital subscribers' individual FIDs, and (3) engaged in this practice without its digital subscribers' knowledge or consent.

5.      Importantly, Defendant shared its digital subscribers' Personal Viewing Information—i.e., digital subscribers' unique FIDs and viewed video content—together as one combined data point. Because a digital subscriber's FID uniquely identifies their individual Facebook user account, Facebook, or any other ordinary person, can use it to quickly and easily locate, access, and view a digital subscriber's corresponding Facebook profile. Put simply,

---

[1] Notably, Facebook Pixel works in conjunction with its Conversion API tool and, as a result, Defendant transmits one copy of its digital subscribers' viewing information directly from its web server to Meta's web servers. Additional copies of this information are communicated through the use of cookies.

Defendant shares its digital subscribers' viewed video media in a manner that allows third parties to know each and every video an individual has viewed on *inquirer.com*.

6.     Defendant profited from its practice of disclosing digital subscribers' Personal Viewing Information to Facebook, and it did so at the expense of its digital subscribers' privacy and their statutory rights under the VPPA.

7.     Because Defendant's digital subscribers were not informed about this dissemination of their Personal Viewing Information—indeed, the transmission of data is automatic and *invisible*—they could not exercise reasonable judgment to defend themselves against the highly personal ways Philadelphia Inquirer has used their data for its own benefit.

8.     Defendant chose to disregard Plaintiffs' and hundreds of thousands of other digital subscribers' statutorily protected privacy rights by releasing their sensitive data to Facebook. Accordingly, Plaintiffs bring this class action lawsuit for legal and equitable remedies to redress Defendant's practices of intentionally disclosing its digital subscribers' Personal Viewing Information to Facebook in knowing violation of VPPA.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Video Privacy Protection Act, 18 U.S.C. § 2710.

10.     This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class (defined below) exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from that of Defendant.

11.     This Court has personal jurisdiction over Defendant because its principal place of business is within this District, and it has sufficient minimum contacts in Pennsylvania to render the exercise of jurisdiction by this Court proper and necessary.

12. Venue is appropriate in this District pursuant to 28 U.S.C. §1391 because Defendant does business in and is subject to personal jurisdiction in this District. Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in or emanated from this District. Further, Plaintiff resided within this judicial district at all times material hereto.

## PARTIES

### Plaintiffs

13. Plaintiff Jason Braun is an adult citizen of Pennsylvania domiciled in Lafayette Hill, Pennsylvania. Plaintiff Braun has been a *Philadelphia Inquirer* digital subscriber for several years and, in the past, maintained a traditional in-print subscription to *Philadelphia Inquirer* beginning in or around 1997. During the relevant time period, Plaintiff Braun accessed his *Philadelphia Inquirer* digital subscription on his laptop, desktop, and smartphone, and he used his subscription to request and view video media on Defendant's website. Plaintiff Braun has had a Facebook account for several years, which he regularly accesses using his laptop, desktop and smartphone. Plaintiff Braun's Personal Viewing Information was disclosed to Facebook pursuant to the systematic process described herein. Plaintiff Braun never gave Defendant express written consent to disclose his Personal Viewing Information, and he was unaware that such information was being shared with Facebook.

14. Plaintiff Jim Cummings is an adult citizen of New Jersey domiciled in Pennsauken, New Jersey. Plaintiff Cummings has been a *Philadelphia Inquirer* digital subscriber for several years and, in the past, maintained a traditional in-print subscription to *Philadelphia Inquirer*. During the relevant time period, Plaintiff Cummings accessed his *Philadelphia Inquirer* digital subscription on his desktop computer and tablet, and he used his subscription to request and view video media on Defendant's website. Plaintiff Cummings has had a Facebook account for several

years, which he regularly accesses from his desktop computer. Plaintiff Cummings' Personal Viewing Information was disclosed to Facebook pursuant to the systematic process described herein. Plaintiff Cummings never gave Defendant express written consent to disclose his Personal Viewing Information, and he was unaware that such information was being shared with Facebook.

***Defendant***

15.     Philadelphia Inquirer LLC is an American media company that owns and operates *Philadelphia Inquirer* and its corresponding website, *inquirer.com*. Defendant delivers and is in the business of delivering, countless hours of video content to its digital subscribers.

## FACTUAL ALLEGATIONS

### I. Background of the Video Privacy Protection Act

16.     The VPPA prohibits the knowing disclosure of a consumer's video rental or sale records without the informed, written consent of the customer in a form "distinct and separate from any form setting forth other legal or financial obligations." Under the statute, the Court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief and attorney's fees.

17.     The VPPA was initially passed in 1988 for the explicit purpose of protecting the privacy of individuals' and their families' video rental, purchase and viewing data. Leading up to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 7-8 (1988).

18.     Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is

now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

19.     In proposing the Video and Library Privacy Protection Act (later codified as the VPPA), Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). Thus, the personal nature of such information, and the need to protect it from disclosure, is the inspiration of the statute: "[t]hese activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id*.

20.     While these statements rang true in 1988 when the VPPA was passed, the importance of legislation like the VPPA in the modern era of data mining from online activities is more pronounced than ever before. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[2]

---

[2] The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary.senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the21stcentury (last accessed March 15, 2022).

21.     In this case, Philadelphia Inquirer violated Plaintiffs' and Class members' privacy rights by systematically disclosing their Personal Viewing Information to Facebook, without obtaining appropriate consent.

**II. Defendant is a Video Tape Service Provider**

22.     Just like "department store[s]," "golf shop[s]," and "continuity club[s]," which the VPPA's legislative history suggests may qualify as video tape service providers, Defendant is a video tape service provider. *See* S. Rep. 100-599, at 12-13.

23.     Defendant is a multimedia organization that provides local and national news, sports updates, entertainment, and commentary, all of which is featured on its website and available to digital subscribers at *inquirer.com*.

24.     Through *inquirer.com*, Defendant creates, hosts, and disseminates numerous videos. On its website menu, for example, Defendant features a section dedicated to video content.

25.     Defendant places advertisements alongside its video content:



26.    Defendant also restricts access to its digital content, including videos.  To access that content on a consistent basis, a user must pay for a subscription.

27.    Thus, Defendant uses these videos as a means of increasing its revenue through advertisements and subscriptions.

### III. Plaintiffs and Class Members are Consumers

28.    To access content on *inquirer.com*, individuals must share identifying information and pay money on a recurring basis. By doing so, individuals subscribe to Defendant's website.

### IV. Defendant Knowingly Disclosed Subscribers' PII to Facebook

29.    Defendant knowingly disclosed its subscribers' personally identifiable information ("PII") to Facebook. At a minimum, Defendant did this through Facebook's Tracking Pixel and Business Tools, including Advanced Matching and Conversion API.

30.    Facebook's Tracking Pixel and related business tools are invisible to website users and consumers. Additionally, Facebook gives website operators, such as Defendant, control over the categories of information and data their website tracks, records, and sends to Facebook. Defendant's knowledge as to its conduct is evidenced by: (1) the fact that it chose to track its digital subscribers' interactions with *inquirer.com*, including the videos they viewed; (2) it requested lines of code that achieved this purpose; (3) it obtained lines of code from Facebook in order to achieve this purpose; and (4) it subsequently installed those lines of code on *inquirer.com*.

### A.    *Philadelphia Inquirer's* Digital Subscriptions

31.    To subscribe to *inquirer.com*, users sign up for an online account and provide additional information including their email address, full name, street address, and credit card information.

32.     On information and belief, all digital subscribers also provide Defendant with their IP address,[3] which informs Defendant as to subscribers' city, zip code and physical location.

33.     Digital subscribers may also provide to Defendant the identifier on their mobile devices and/or cookies stored on their devices.

34.     Defendant did not disclose that it shared its digital subscribers Personal Viewing Information with third parties, such as Facebook, during the registration process or when digital subscribers logged in and viewed video media.

35.     Notably, Defendant never obtained its digital subscribers' written consent to collect their Personal Viewing Information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," as the VPPA requires.

36.     Defendant, moreover, failed to inform online customers and obtain appropriate consent prior to disclosing their private and protected viewing information to third parties, including Facebook.

**B. Facebook and the Facebook Tracking Pixel**

37.     Facebook is a real identity platform, meaning that users are allowed only one account and must share the name they go by in everyday life.  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.

38.     Businesses, such as *Philadelphia Inquirer*, use Facebook's Business Tools, including tracking pixels, to monitor and record their website visitors' devices and activities on a particular website. As a result, website visitors' browsing data and interactions with a website are sent to Facebook, which then uses the information for marketing purposes.

---

[3] An IP address unique number assigned to all information technology connected devices.

39.     The Facebook tracking pixel, also known as a "tag" or "web beacon" among other names, is invisible to ordinary consumers but tracks their actions on Facebook advertisers' websites and reports them to Facebook. It is a version of the social plugin that gets "rendered" with code from Facebook. To obtain the code for the pixel, the website advertiser tells Facebook which website events it wants to track (e.g., video views and button clicks) and Facebook returns corresponding Facebook pixel code for the advertiser to incorporate into its website.

40.     *Philadelphia Inquirer* installed the Facebook tracking pixel, which enabled it to disclose Plaintiffs' and Class members' Personal Viewing Information to Facebook. Defendant's motivation for using the pixel and related Facebook Business Tools is simple— it financially benefits it in the form of advertising and information services. When an *inquirer.com* digital subscriber enters the website and views video media, the website automatically sends to certain information about the viewer, such as their identity and viewed media content, to Facebook. Defendant sends Facebook data that identifies an individual *inquirer.com* digital subscriber (Facebook ID) alongside the name of the viewed video content (its URL).

41.     The Facebook ID ("FID") is a unique and persistent identifier that Facebook assigns to each user. With it, any ordinary person can look up the user's Facebook profile and name. When a Facebook user with one or more personally identifiable FID cookies stored on his or her browser views video media on *inquirer.com*, Defendant, through its website code, causes the digital subscriber's identity and viewed video media to be transmitted to Facebook through the user's browser. This transmission was not the digital subscriber's decision but resulted from Defendant's purposeful use of the Facebook tracking pixel. Defendant could have easily programmed the website so that this information was not automatically transmitted to Facebook when a subscriber

views video media. However, it was not in Defendant's financial interest to do so because providing this highly sought-after information is financially beneficial to it.

42.    Notably, the ability to easily identify any individual by using their unique FID is not limited to Facebook. Any ordinary person who comes into possession of an FID can easily use that information to identify a particular individual, and Facebook admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile, which may contain information such as a Facebook user's name, gender, birthday, place of residence, career, educational history, a multitude of photos, and the content of a Facebook user's posts. This information may reveal even more sensitive personal information—for instance, posted photos may disclose the identity of family members, and written posts may disclose religious preferences, political affiliations, personal interests and more. Simply put, with only an FID and the video content name and URL—all of which Defendant knowingly and readily provides to Facebook—any ordinary person could learn the identity of a particular digital subscriber and the specific video or media content they requested on *inquirer.com.*

43.    At all relevant times, Defendant knew that the Facebook pixel disclosed Personal Viewing Information to Facebook. This was evidenced from, among other things, the manner in which Defendant programmed and deployed the pixel on its website, including its decision to track digitals subscribers' viewing history in order to use that information for its own benefit.

**C. Defendant and the Facebook Pixel**

44.    Defendant maintains a vast digital database comprised of its digital subscribers' Personal Viewing Information, including the names and e-mail addresses of each digital subscriber and information reflecting the video media that each of its digital subscribers viewed.

45.    The data Defendant shared with Facebook is not anonymized. To the contrary, the data it disclosed is tied to unique identifiers that track specific Facebook users. Importantly, the

recipient of the Personal Viewing Information—Facebook—*receives the Personal Viewing Information as one data point*. Defendant thus monetized its database by disclosing its digital subscribers' Personal Viewing Information to Facebook in a manner allowing it to make a direct connection—without the consent of its digital subscribers and to the detriment of their legally protected privacy rights.

46.     Critically, the Personal Viewing Information Defendant disclosed to Facebook allows Facebook to build from scratch or cross-reference and add to the data it already has in their own detailed profiles for its own users, adding to its trove of personally identifiable data.

47.     These factual allegations are corroborated below. For example, Figure 1 shows a screenshot of an article and the corresponding video that a digital subscriber could view during the Class Period by visiting *inquirer.com* and clicking on the title, "*Video of snow-covered Atlantic city Expressway*."



**Figure 1. The screenshot above was taken from Defendant's website, inquirer.com/news/video/video-snow-covered-atlantic-city-expressway-20220103.html#loaded.**

48. As demonstrated below in Figure 2, Defendant sends video content name (the URL) and the digital subscriber's FID ("c_user") to Facebook.

```
URL
+  https://www.facebook.com/tr/
HEADERS
+  accept:                text/html,application/xhtml+xml,application
                          /xml;q=0.9,image/avif,image/webp,image/apng
                          ,*/*;q=0.8,application/signed-
                          exchange;v=b3;q=0.9
+  accept-encoding:       gzip, deflate, br
+  accept-language:       en-US,en;q=0.9
+  cache-control:         max-age=0
+  connection:            keep-alive
+  content-length:        4498
+  content-type:          application/x-www-form-urlencoded
+  cookie:                sb=GNrWYXriZ33m8uelAIBgSJas;
                          datr=GtrWYSKtYuwbA9_YtaiB7Jxj; dpr=1.25;
                          c_user=645          ;
                          xs=45%3ASyqZkRvxweO4rw%3A3A1641470502%3A-
                          1%3A15165;
                          fr=0bgnZk3NcOj5w451Y.AWXNO8VW9XbTCVO4kCBkrP
                          N8Itc.Bh1sf_.Pr.AAA.0.0.Bh1tom.AWWFNdWYADc;
                          spin=r.1004913746_b.trunk_t.1641470508_s.1_
                          v.2_
+  host:                  www.facebook.com
+  origin:                https://www.inquirer.com
+  referer:               https://www.inquirer.com/
   sec-ch-ua:             " Not A;Brand";v="99", "Chromium";v="96",
                          "Google Chrome";v="96"
```

inquirer.
com%2Fnews%2Fvideo%2Fvideo-snow-covered-atlantic-city-expressway-2
0220103.html&if=false&ts=1641470659944&cd%5BDataLayer%5D=%5B%5D&
cd%5BMeta%5D=%7B%22title%22%3A%22Video+of+snow-covered+Atlantic
+City+Expressway%22%2C%22meta%3Adescription%22%3A%22An+Inquirer
+photographer+captures+video+of+snow+covering+the+Atlantic+City
+Expressway+in+New+Jersey+on+Monday%2C+January+3%2C+2022.%22%7D&
cd%5BOpenGraph%5D=%7B%22og%3Asite_name%22%3A%22https%3A%2F%2Fwww.
inquirer.
com%22%2C%22og%3Alocale%22%3A%22en_US%22%2C%22og%3Atitle%22%3A%22V
ideo+of+snow-covered+Atlantic+City
+Expressway%22%2C%22og%3Aimage%22%3A%22https%3A%2F%2Fwww.inquirer.
com%2Fresizer%2FOHia5CY8nVZAzKyaOaHurrIk1Ro%3D%2F760x507%2Fsmart%2
Ffilters%3Aformat%28webp%29%2Fd1dazej9q2gz23.cloudfront.
net%2F01-03-2022%2Ft_247ea3a30b8b476d844dfe51aa319a4e_name_file_19
20x1080_5400_v4_.

**Figure 2. Screenshot of data sent to Facebook during a HTTP single communication session, which reveals an *inquirer.com* subscribers' Personal Viewing Information. The user's FID (c_user field) is communicated alongside the video name and content.**

49.     Defendant intentionally and knowingly disclosed Plaintiffs' and Class members' Personal Viewing Information—revealing its digitals subscribers' identities alongside the specific video material they requested—because Defendant is responsible for which type of data is tracked, recorded, and communicated to Facebook via *inquirer.com* and the Facebook pixel.

50.     Defendant knew it was collecting this data and sending it to Facebook, and yet it failed to request or obtain its digital subscribers' written consent prior to these disclosures. As a result, Defendant has intentionally and knowingly violated the VPPA.

51.     Tracking pixels are not necessary for Defendant to operate *inquirer.com.* Rather, their sole purpose and function is to enrich Defendant's advertising and marketing efforts.

52.     Even if the Defendant finds the Facebook tracking pixel useful for other purposes, it could have used the tool without revealing and disclosing its digital subscribers' Personal Viewing Information. In any event, Defendant was required to comply with the VPPA's statutory consent requirements prior to sharing its digital subscribers' Personal Viewing Information with third parties, which it failed to do. Notably, even Facebook forbids the disclosure of such information and requires its advertising partners, such as Defendant, to comply with the VPPA (and relevant state laws).

**D.  Plaintiff Braun's Digital Subscription to *Philadelphia Inquirer***

53.     Plaintiff Jason Braun became a digital subscriber to *Philadelphia Inquirer* by providing, among other information, his name, address, email address, IP address (which informs Defendant as to the city and zip code he resides in as well as his physical location), and any cookies associated with his device(s). Plaintiff Braun pays for his digital subscription to *Philadelphia Inquirer* and receives emails and other news alerts from Defendant in conjunction with this subscription.

54.     During the last year, Plaintiff Braun used his laptop, desktop computer, and smart phone to view video media on *inquirer.com* and, as an avid sports fan, recalls watching sports-related videos, especially with regard to the Phillies.

55.     Plaintiff Braun has had a Facebook account for several years, which he regularly accesses from his laptop, desktop computer, and smartphone. Plaintiff Braun's Facebook account contains additional personal information and other personal details.

56.     Plaintiff Braun never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to Facebook. Plaintiff Braun has never been provided any written notice that Defendant was disclosing its digital subscribers' Personal Viewing Information, or any means of opting out of such disclosures. Defendant nonetheless knowingly disclosed his Personal Viewing Information to Facebook.

57.     Because Plaintiff Braun is entitled by law to privacy in his Personal Viewing Information, Defendant's disclosure of his Personal Viewing Information deprived him of the full set of benefits to which he was entitled to as a *inquirer.com* digital subscriber.

**E.   Plaintiff Cummings' Digital Subscription to *Philadelphia Inquirer***

58.     Plaintiff Jim Cummings became a digital subscriber to *Philadelphia Inquirer* by providing, among other information, his name, address, email address, IP address (which informs Defendant as to the city and zip code he resides in as well as his physical location), and any cookies associated with his device(s). Plaintiff Cummings pays for his digital subscription to *Philadelphia Inquirer* and receives emails and other news alerts from Defendant in conjunction with this subscription.

59.     During the last year, Plaintiff Cummings used his desktop computer and tablet to view video media on *inquirer.com* and specifically recalls watching news-related videos on a regular basis.

60.     Plaintiff Cummings has had a Facebook account for several years, which he regularly accesses from his desktop computer and smartphone. Plaintiff Cummings' Facebook account contains additional personal information and other personal details.

61.     Plaintiff Cummings never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to Facebook. Plaintiff Cummings has never been provided any written notice that Defendant was disclosing its digital subscribers' Personal Viewing Information, or any means of opting out of such disclosures. Defendant nonetheless knowingly disclosed his Personal Viewing Information to Facebook.

62.     Because Plaintiff Cummings is entitled by law to privacy in his Personal Viewing Information, Defendant's disclosure of his Personal Viewing Information deprived him of the full set of benefits to which he was entitled to as a *inquirer.com* digital subscriber.

## V.     CLASS ACTION ALLEGATIONS

63.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(a), (b)(1), (b)(3), and/or (c)(4). Specifically, the Class is defined as:

> All persons in the United States with a digital subscription to
> *inquirer.com* who had their Personal Viewing Information disclosed
> to Facebook by Defendant.

64.     The "Class Period" is from January 1, 2013 to present.

65.     Excluded from the Class are Defendant, their past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns and any entity in which any of

them have a controlling interest, as well as all judicial officers assigned to this case as defined in 28 USC § 455(b) and their immediate families.

66.      <u>Numerosity</u>. Class members are so numerous and geographically dispersed that joinder of all Class members is impracticable. Plaintiffs believe that there are hundreds of thousands of Class members widely dispersed throughout the United States. Class members can be identified from Defendant's records and non-party Facebook's records.

67.      <u>Typicality</u>. Plaintiffs' claims are typical of the claims of members of the Class. Plaintiffs and Class members were harmed by the same wrongful conduct in that Defendant caused their Personal Viewing Information to be disclosed to Facebook without obtaining express written consent in a form that comports with the VPPA's statutory requirements. Plaintiffs' claims are based on the same legal theories as the claims of other Class members.

68.      <u>Adequacy</u>. Plaintiffs will fairly and adequately protect and represent the interests of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class. Plaintiffs are represented by counsel with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically.

69.      <u>Commonality and predominance</u>. Questions of law and fact common to the Class members predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct.  Questions of law and fact common to the Class include:

> (a)      Whether Defendant knowingly disclosed Class members' Personal Viewing Information to Facebook;

(b)     Whether the information disclosed to Facebook concerning Class members' Personal Viewing Information constitutes personally identifiable information under the VPPA;

(c)     Whether Defendant's disclosure of Class members' Personal Viewing Information to Facebook was knowing under the VPPA;

(d)     Whether Class members consented to Defendant's disclosure of their Personal Viewing Information to Facebook in the manner required by 18 U.S.C. § 2710(b)(2)(B);

(e)     Whether Defendant was unjustly enriched as a result of its disclosures; and

(f)     Whether the Class is entitled to damages as a result of Defendant's conduct.

70.     <u>Superiority</u>. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiffs know of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## VI.     <u>TOLLING OF THE STATUTES OF LIMITATIONS</u>

71.     All applicable statute(s) of limitations have been tolled by Defendant's knowing and active concealment and of the facts alleged herein. Plaintiffs and Class members could not

have reasonably discovered Defendant's practices of sharing their Personal Viewing Information and PII with Facebook until shortly before this class action litigation commenced.

72.     Defendant was and remains under a continuing duty to disclose to Plaintiffs and Class members its practice of sharing Personal Viewing Information and PII to Facebook. As a result of the active concealment by Defendant, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## VII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710**

73.     Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

74.     The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C § 2710.

75.     As defined in 18 U.S.C. §2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

76.     Defendant is a "video tape service provider" as defined in 18 U.S.C. §2710(a)(4) because it is engaged in the business of delivering audiovisual materials that are similar to prerecorded video cassette tapes and those sales affect interstate or foreign commerce.

77.     As defined in 18 U.S.C. §2710(a)(3), "personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

78.     Defendant knowingly caused Personal Viewing Information, including FIDs, concerning Plaintiffs and Class members to be disclosed to Facebook. This information constitutes personally identifiable information under 18 U.S.C. §2710(a)(3) because it identified each Plaintiff and Class member to Facebook as an individual who viewed or requested specific video media through *inquirer.com*.

79.     As defined in 18 U.S.C. §2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged in the preceding paragraphs, Plaintiffs are paid subscribers to *inquirer.com*, which provides digital subscribers with video media content through the digital subscriber's desktop, tablet, and/or mobile device. Thus, Plaintiffs are "consumer[s]" under this definition.

80.     As set forth in 18 U.S.C. §27109(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner." Defendant failed to obtain informed, written consent under this definition.

81.     In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide an opportunity to opt out as required by the VPPA.

82.     Defendant knew that its disclosures identified Plaintiffs and Class members to Facebook. Defendant also knew that Plaintiffs' and Class members' Personal Viewing Information

was disclosed to Facebook because, *inter alia*, Defendant chose, programmed, and intended for Facebook to receive the video content name, its URL, and, most notably, the digital subscribers' FID.

83.    By disclosing Plaintiffs' and the Class members' Personal Viewing Information, Defendant violated Plaintiffs' and the Class members' statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

84.    As a result of the above violations, Defendant is liable to the Plaintiffs and other Class members for actual damages related to their loss of privacy in an amount to be determined at trial or alternatively for "liquidated damages not less than $2,500 per plaintiff." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

**SECOND CLAIM FOR RELIEF**
**Unjust Enrichment**

85.    Plaintiffs incorporate and reallege the above factual allegations by reference.

86.    Defendant acted wrongfully by sharing its digital subscribers' Personal Viewing Information with Facebook without first obtaining proper consent pursuant to the VPPA's statutory requirements (in a standalone consent form), and, as a result, Defendant profited from advertising revenue it would not have otherwise received. Notably, Defendant benefited to the detriment of Plaintiffs and Class members because it disregarded its digital subscribers' privacy rights for the sake of increasing its own revenue and profits.

87.    Defendant's retention of these ill-gotten gains is unjust and inequitable.

88.    Plaintiffs, on behalf of themselves and the Class, accordingly seek restitution, restitutionary disgorgement, and all other appropriate relief permitted by the law of unjust

enrichment. There is no adequate remedy at law that would provide redress to Plaintiffs and the Class or ensure that Defendant will not deploy the same data practices in the future.

## VIII.   RELIEF REQUESTED

89.     Plaintiffs, on behalf of themselves and the proposed Class, respectfully request that this Court:

(a)     Determine that this action is properly maintained as a class action pursuant to Rules 23(a), (b)(1), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Plaintiffs as the representatives of the Class;

(b)     For an order declaring that Defendant's conduct, as described herein, violates the VPPA, 18 U.S.C. § 2710(c)(2)(D);

(c)     For Defendant to pay $2,500.00 to each Plaintiff and Class member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(d)     For punitive damages, as warranted, in an amount to be determined at trial, 18 U.S.C. § 2710(c)(2)(B);

(e)     For prejudgment interest on all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief; and

(g)     For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit, 18 U.S.C. § 2710(c)(2)(C).

## IX.   JURY DEMAND

90.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and the proposed Class, demand a trial by jury on all issues so triable.

Dated: October 19, 2022          Respectfully submitted,

*/s/ Arthur Stock*
Arthur Stock
**MILBERG  COLEMAN  BRYSON  PHILLIPS GROSSMAN, PLLC**
800 S. Gay Street, Ste. 1100
Knoxville, TN  37929
Tel: (865) 247-0080
Fax: (865) 522-0049
astock@milberg.com

Gary M. Klinger*
Alexandra M. Honeycutt*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: (847) 208-4585
gklinger@milberg.com
ahoneycutt@milberg.com

Nick Suciu III*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Tel: 313-303-3472
nsuciu@milberg.com

Joshua D. Arisohn*
Philip L. Fraietta*
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com
pfraietta@bursor.com

Christopher R. Reilly*
**BURSOR & FISHER, P.A.**
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Tel: (305) 330-5512
Fax: (305) 679-9006
E-Mail: creilly@bursor.com

Adam E. Polk (SBN 273000)
Simon Grille (SBN 294914)
Kimberly Macey (SBN 342019)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
apolk@girardsharp.com
sgrille@girardsharp.com
kmacey@girardsharp.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff and the Putative Class*